# IN THE SUPREME COURT OF IOWA

No. 10–0828

Filed September 23, 2011

**STATE OF IOWA,**

Appellee,

vs.

**ROBIN EUGENE BRUBAKER,**

Appellant.

Appeal from the Iowa District Court for Woodbury County, John C. Nelson, Judge.

Appeal from judgment of conviction and sentence for unlawful possession of a prescription drug in violation of Iowa Code section 155A.21(1) (2009). **REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**

Mark C. Smith, State Appellate Defender, and Dennis D. Hendrickson, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, Patrick A. Jennings, County Attorney, and Bobbier A. Johnson, Assistant County Attorney, for appellee.

**WIGGINS, Justice.**

A jury found the defendant guilty of operating while intoxicated (OWI), fourth offense, in violation of Iowa Code section 321J.2 (2009) and unlawful possession of a prescription drug in violation of Iowa Code section 155A.21(1). On appeal, the defendant contends that the district court erred by denying his motion to suppress evidence found in his car when officers searched it after his arrest and that his trial counsel was ineffective for failing to object specifically to the sufficiency of evidence offered by the State regarding the charge of unlawful possession of a prescription drug. On our de novo review of the record, we find that trial counsel was ineffective and that, if he made the proper objection regarding the sufficiency of evidence, the district court would have dismissed the unlawful possession charge. Consequently, we reverse the judgment for unlawful possession of a prescription drug and remand the case for dismissal of that charge.

## I. Background Facts and Proceedings.

William Nice is a K-9 officer with the Sioux City Police Department. Nice has been with the Sioux City police approximately seven years. His normal duties include routine patrol, calls for service, and traffic enforcement. On January 16, 2009, Nice was working the second watch, from 2:30 to 10:30 p.m. Just before 9:00 p.m., Nice observed a red Buick LeSabre straddling the center turn lane at the intersection of 14th and Jackson Streets. Robin Brubaker was the driver of the vehicle. After Nice maneuvered his marked patrol car behind the LeSabre, Brubaker immediately turned it into the parking lot of a convenience store. Nice continued on with his patrol.

A few minutes later, Nice observed the same LeSabre traveling north on Nebraska Street. Once again, Nice maneuvered his patrol car

behind the LeSabre, and, once again, Brubaker immediately turned into a parking lot. Brubaker activated his turn signal, but only after initiating the turn. Brubaker parked in the lot near the north end of a grocery store, but did not exit the vehicle. Nice continued on, but parked in a location where he could observe the LeSabre.

It was now approximately 9:10 p.m., and the grocery store was closed. However, the store's lights were still on, and employees were still inside. Nice determined that the LeSabre's engine was still running because he could observe exhaust coming from the tailpipe due to the cold weather. After a few minutes the exhaust stopped. Brubaker remained in the vehicle.

Nice thought it was strange someone would sit in a vehicle that was not running, given the extreme cold. At the suppression hearing, Nice acknowledged that Brubaker could have been waiting for an employee getting off work or that he was trying to conserve gasoline. Further, Nice stated that Brubaker was not engaged in any criminal activity at the time and that there was no specific criminal activity afoot. Nevertheless, Nice decided to approach Brubaker as a casual encounter to see why Brubaker was acting the way he was, if he had any good reason for being there, if there was anything wrong, or if he was lost. Additionally, Nice was concerned that Brubaker could have been having a medical problem. Nice also considered that he had witnessed Brubaker commit two minor traffic infractions. In short, the totality of everything that Nice observed up to that point prompted him to approach the vehicle.

As he drove his patrol car into the store parking lot, Nice did not activate his lights, but turned on the camera mounted in his patrol car and parked at an angle behind the LeSabre. He testified that he did not

consider this a traffic stop. Nice, in full police uniform, approached the driver's side of the LeSabre. Upon reaching the driver's door of the LeSabre, he observed Brubaker reading a brochure. Nice tapped on the window, and Brubaker opened the car door.

Nice greeted Brubaker and asked him how he was doing. Nice reported an overwhelming odor of alcohol coming from inside the vehicle. Nice further queried Brubaker as to where he was coming from, if he was drinking, and what was he doing. While doing so, Nice observed that Brubaker slurred his speech and had bloodshot, watery eyes. Less than thirty seconds after his initial contact with Brubaker, Nice called for the assistance of an Alcohol Safety Action Program (ASAP) officer to conduct field sobriety tests.

Sioux City police officer Angela Kolker arrived at the parking lot at 9:12 p.m. Kolker has been a police officer for thirteen years and is trained in OWI detection, recognition, field sobriety tests, and implied consent. Kolker approached the LeSabre from the passenger's side while Brubaker was still sitting in his car, talking to Nice. From her vantage point, Kolker observed an open twelve-pack of beer on the floorboard in the rear of the vehicle.

Nice asked Brubaker to surrender the keys to the vehicle. Instead, Brubaker picked up the keys from the passenger seat and put them in his pocket. Nice denied Brubaker's request to leave and advised Brubaker of his *Miranda* rights.

Kolker informed Nice that there was a fifteen-minute observation period required prior to administering a preliminary breath test and that during that time nothing could go into Brubaker's mouth, as it could cause a false reading. Nice asked Brubaker if he had anything in his mouth. Brubaker then produced a piece of candy and began to unwrap

it.  Nice advised Brubaker not to put the candy into his mouth. Defiantly, Brubaker put the candy into his mouth.

Nice then ordered Brubaker out of the car.  Brubaker refused and grabbed the steering wheel.  Nice and Kolker attempted, unsuccessfully, to physically remove Brubaker from the LeSabre.  Utilizing a Taser, Nice and Kolker forcibly removed Brubaker from the vehicle.  Out of the car, Brubaker continued to be noncompliant.  Eventually, Nice and Kolker subdued Brubaker and took him into custody.  They then moved Brubaker to a squad car, and another officer transported Brubaker to the jail.  Brubaker was arrested for failure to obey and subsequently for operating a motor vehicle while intoxicated.

At trial, Kolker testified that she observed Brubaker for approximately fifteen to twenty minutes during the encounter.  Kolker believed that Brubaker was under the influence of something based on, among other things, Brubaker's slow movements.  For example, when Nice asked for the keys, it seemed Brubaker had forgotten what he was going to do with them once he found them.  Kolker further testified that Brubaker showed impaired decision making.  The district court allowed Kolker's opinion over defense counsel's objection finding that she had been trained to recognize the signs of intoxication and that she had dealt with intoxicated people many times.

Once Brubaker was removed from the scene, Kolker and Nice searched Brubaker's car, including under the rear seat cushion and in the trunk.  They did not have a search warrant for the vehicle, but believed it to be justified as a search incident to the arrest.  The interior of Brubaker's car was very cluttered.  There were several containers of beer, some of which were open.  Additionally, Kolker and Nice searched a

large duffel bag containing clothes and toiletries. Inside a sock, Kolker discovered a scale.

As to the search under the rear seat, Kolker testified:

> And when we moved the clothes and then the seat for the - - the back seat is just one big cushion that you can - - that you can take - - lift out and move. And underneath there, there was a - - first thing that we found was an eyeglasses case, like a soft one, that had - - I think it was soft, that had syringes in it, and there was a - - like a prescription pill bottle, one of those plastic brown bottles, didn't have a label printed stuck to it, but it was a - - like a brown prescription bottle with some pills in it. And then there was a second eyeglasses case that had more syringes in it. And the last thing was a glass meth pipe that had some like some - - like steel wool stuff in it - - tucked in it.

Kelli Bodwell is a criminalist with the Criminalist Laboratory of the Iowa Division of Criminal Investigation. As part of her job, Bodwell analyzes physical evidence in criminal cases, writes reports on the findings, and testifies in court, if necessary. Bodwell examined the fifty-one yellow pills found inside the brown prescription bottle taken from Brubaker's vehicle.

Bodwell's report stated the pills were "consistent in appearance with a pharmaceutical preparation containing [C]lonazepam." Bodwell also testified that Clonazepam was a Schedule IV controlled substance, requiring a prescription.

The jury found Brubaker guilty of operating while intoxicated and unlawful possession of a prescription drug. The district court entered judgment and imposed sentences for the two convictions. Brubaker timely filed his notice of appeal.

Brubaker testified that his car had been previously owned by three or four other people. He further testified that he frequently had passengers in the back seat of his car. Brubaker denied that he was

intoxicated and testified that he did not cooperate with officers because he was upset with what he believed was bullying by the officer. He stated that he was not an intravenous drug user and denied knowing anything about the pills found in his car. Likewise, he denied knowing how the syringes and pipe got into his vehicle.

## II. Issues.

Brubaker asserts that the district court erred in denying his motion to suppress the pills found in his vehicle at the time of his arrest. Additionally, Brubaker contends that his trial counsel was ineffective because he failed to argue specifically in his motion for judgment of acquittal that there was insufficient evidence to prove that the substance he possessed was Clonazepam. The issue involving the sufficiency of evidence is dispositive of this appeal. Therefore, we will not address any other issue presented.

## III. Preservation of Error.

At the close of the State's case, trial counsel for Brubaker moved for a directed verdict of acquittal alleging broadly that the State failed to generate a jury question and prove the elements of the offenses as charged. *See* Iowa R. Crim. P. 2.19(8). We have held, "To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds raised on appeal." *State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004). The motion for directed verdict of acquittal by Brubaker's trial counsel lacked any specific grounds, and thus, the error was not preserved.

Failure of trial counsel to preserve error at trial can support an ineffective-assistance-of-counsel claim. *Id.* at 615–16. "Ineffective-assistance-of-counsel claims have their basis in the Sixth Amendment to

the United States Constitution." *State v. Vance,* 790 N.W.2d 775, 785 (Iowa 2010). A defendant may raise the ineffective assistance claim on direct appeal if he or she has reasonable grounds to believe the record is adequate to address the claim on direct appeal. Iowa Code § 814.7(2). We acknowledge that ineffective-assistance-of-counsel claims are normally considered in postconviction relief proceedings. *State v. Soboroff,* 798 N.W.2d 1, 8 (Iowa 2011). A primary reason for doing so is to ensure development of an adequate record to allow the attorney charged to respond to the defendant's claims. *State v. Coil,* 264 N.W.2d 293, 296 (Iowa 1978). However, "[p]reserving ineffective-assistance-of-counsel claims that can be resolved on direct appeal wastes time and resources." *Truesdell,* 679 N.W.2d at 616. Having reviewed the record in the case before us, we conclude that the record is sufficient to address a claim of ineffective assistance of counsel, and this claim should not be preserved for a postconviction relief proceeding.

### IV. Scope of Review.

A claim of ineffective assistance of counsel is reviewed de novo. *Id.* at 615. We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Webb,* 648 N.W.2d 72, 75 (Iowa 2002). We will uphold a verdict if it is supported by substantial evidence. *Id.* at 75. When a rational fact finder is convinced by the evidence that the defendant is guilty beyond a reasonable doubt, the evidence is substantial. *Id.* at 75–76. "The evidence is reviewed in the light most favorable to the State, and all of the evidence presented at trial, not just evidence that supports the verdict, is considered." *State v. Kemp,* 688 N.W.2d 785, 789 (Iowa 2004). However, it is the State's "burden to prove every fact necessary to constitute the crime with which the defendant is

charged, and the evidence presented must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture." *Id.*

### V. Ineffective Assistance of Counsel.

**A. Generally.** To establish an ineffective-assistance-of-counsel claim, a defendant must prove by a preponderance of the evidence: (1) trial counsel failed to perform an essential duty, and (2) prejudice resulted. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). "Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice, with performance being measured against an 'objective standard of reasonableness,' 'under prevailing professional norms.'" *State v. Maxwell,* 743 N.W.2d 185, 195 (Iowa 2006) (quoting *Rompilla v. Beard,* 545 U.S. 374, 380, 125 S. Ct. 2456, 2462, 162 L. Ed. 2d 360, 371 (2005) (internal citations omitted)) (internal quotation marks omitted).

**B. Failure to Perform an Essential Duty.** "[C]laims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney." *Ledezma v. State,* 626 N.W.2d 134, 143 (Iowa 2001). "We begin with the presumption that the attorney performed competently" and "avoid second-guessing and hindsight." *Id.* (internal citations omitted). We will not find counsel incompetent for failing to pursue a meritless issue. *State v. Greene,* 592 N.W.2d 24, 29 (Iowa 1999).

1. *Meritless issue.* Brubaker's trial attorney performed competently if it would have been meritless to argue specifically in his motion for judgment of acquittal that there was insufficient evidence to prove the substance Brubaker possessed was Clonazepam. Thus, we must first determine the merits of such an argument.

Iowa Code section 155A.21(1) provides, "A person found in possession of a drug or device limited to dispensation by prescription, unless the drug or device was so lawfully dispensed, commits a serious misdemeanor." Iowa Code § 155A.21(1). To be convicted, the following three elements must be established: (1) Brubaker was found in possession, (2) of a prescription drug, and (3) the drug was not lawfully dispensed to him. Brubaker insists the State failed to establish beyond a reasonable doubt that the fifty-one pills found in his vehicle alleged to be Clonazepam, were, in fact, Clonazepam.

On direct examination the State solicited the following testimony from Bodwell:

> Q. Miss Bodwell, what is your occupation? A. I'm a criminalist with the Iowa Division of Criminal Investigation Laboratory.
>
> . . . .
>
> Q. As part of your duties, do you analyze prescription drugs too? A. I will look at prescription drugs and analyze them as necessary, yes.
>
> Q. And how do you do this? A. If it is a Schedule III or below controlled substance, the normal procedure is to look at it visually, then compare it to reference materials.
>
> . . . .
>
> Q. Thank you. Miss Bodwell, do you recognize this? A. Yes, I do.
>
> Q. And what is it? A. State's Exhibit Number 4 is a copy of the report that I prepared, April 22, 2009, concerning this case.
>
> . . . .
>
> Q. And what does this report indicate? A. [F]ifty-one yellow tablets [that are] consistent with the appearance of a pharmaceutical, Clonazepam, a Schedule IV controlled substance.

Q. And is a prescription required for Clonazepam? A. Yes, it is.

Q. And how do you know this? A. Per the reference material that I looked up to find what this drug was; it indicated that it was a prescription drug.

Bodwell's report reads as follows: "FINDINGS: *consistent in appearance with a pharmaceutical preparation containing clonazepam, Schedule IV.*" (Emphasis added.) The record lacks any other evidence regarding the positive identification of the fifty-one yellow pills found in Brubaker's vehicle.

We have always recognized that, for a person to be convicted of a drug offense, the State is not required to test the purported drug. *In the Interest of C.T.*, 521 N.W.2d 754, 757 (Iowa 1994). The finder of fact is free to use circumstantial evidence to find that the substance is an illegal drug. *Id.* The reason for this rule is that circumstantial evidence is not inferior to direct evidence. *State v. Blair*, 347 N.W.2d 416, 421 (Iowa 1984). In a given case, circumstantial evidence may be more persuasive than direct evidence. *State v. Stamper*, 195 N.W.2d 110, 111 (Iowa 1972). Circumstantial evidence is equally probative as direct evidence for the State to use to prove a defendant guilty beyond a reasonable doubt. *State v. O'Connell*, 275 N.W.2d 197, 205 (Iowa 1979).

The question we must decide is whether a rational trier of fact could have found that all essential elements of the crime were established beyond a reasonable doubt based on the evidence produced at trial. *State v. Robinson*, 288 N.W.2d 337, 339 (Iowa 1980). "Inferences drawn from the evidence must raise a fair inference of guilt on each essential element . . . ." *Truesdell*, 679 N.W.2d at 618. An inference must do more than "create speculation, suspicion, or conjecture." *Webb*, 648 N.W.2d at 76. Evidence that allows two or more

inferences to be drawn, without more, is insufficient to support guilt. *Truesdell*, 679 N.W.2d at 618–19.

The State chose not to have the pills tested or call a qualified expert witness to testify that the pills were, in fact, Clonazepam. Thus, there is no direct evidence that the pills found in Brubaker's vehicle were a prescription drug. Instead, the State relied on the testimony of a criminalist who compared the pills to a picture of Clonazepam. After making the comparison, the criminalist was only able to say the pill was consistent in appearance with a pharmaceutical preparation containing Clonazepam. Just because a pill looks like Clonazepam does not mean it is Clonazepam.

The criminalist also testified that Clonazepam was a prescription drug by looking in the same reference material that led her to conclude the pill was consistent in appearance with Clonazepam. This testimony, alone or with her other testimony, does not establish that the pills were Clonazepam.

One court listed six factors a fact finder could use to determine whether a substance is an illegal drug in lieu of expert testimony. *United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976).

> Such circumstantial proof may include evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence.

*Id.*

Other courts have listed additional circumstantial evidence to aid the state in its burden to prove a substance is an illegal drug. These factors include whether ingestion of the substance caused a change in the defendant's behavior, *Chancey v. State*, 349 S.E.2d 717, 725 (Ga. 1986); whether the defendant referred to the substance as "very good stuff," *Swain v. State*, 805 P.2d 684, 686 (Okla. Crim. App. 1991); and whether the known odor of the substance identified it as an illegal drug, *State v. Salois*, 766 P.2d 1306, 1310 (Mont. 1988). These factors are not exclusive, and the state is not required to prove all of these circumstances were present to sustain a conviction. Rather, we look at these circumstances in light of the evidence produced at trial to determine whether the state produced sufficient evidence to support the proposition that the substance was an illegal substance when expert testimony did not identify the substance as illegal.

Applying this standard, we find the jury was left to speculate as to whether the pills were Clonazepam and to rely upon conjecture to reach a verdict of guilt. We reach this conclusion for a number of reasons. First, although the criminalist testified that the pills appeared to be Clonazepam, an examination of the pills reveals that they are similar in size, shape, and consistency to aspirin and other over-the-counter drugs readily available without a prescription. Second, even though the officers found the pills in a generic pill bottle, the bottle contained no label or other indication of the identity of its contents. Many people use old prescription bottles to store items, including pills. Third, although the officers found the pills with a syringe and a glass pipe, there is no evidence that the syringe or pipe found in the car had anything to do with illegal drug use. The State did not put on any testimony that a person could crush, dissolve, and use Clonazepam by smoking it or

injecting it into his or her body. The fact that the pills appear to be Clonazepam and that the officers found them under the back seat is insufficient to establish they were, in fact, Clonazepam.

The testimony presented at trial only indicated that a criminalist, whose training or prior experience was unknown, compared the pills to reference materials and, after doing so, could only state that the pills were "consistent in appearance with a pharmaceutical preparation containing [C]lonazepam." The criminalist did not specify that the pills were Clonazepam, nor does she explain how she reached her conclusion that the pills were consistent in appearance with a pharmaceutical preparation containing Clonazepam. Under this record, the criminalist's testimony is not sufficient to allow the jury to make a finding the pills were, in fact, Clonazepam without speculating that the pills were Clonazepam. Consequently, if trial counsel had made the proper motion for acquittal based upon the State's failure to provide sufficient evidence to support the necessary element of the crime that the pills were Clonazepam, the court would have sustained the motion.

2. *Trial strategy.* "Miscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel." *Ledezma,* 626 N.W.2d at 143. "Trial counsel's performance is measured objectively by determining whether counsel's assistance was reasonable, under prevailing professional norms, considering all the circumstances." *State v. Lyman*, 776 N.W.2d 865, 878 (Iowa 2010). The Supreme Court indicates the prevailing norms of practice are reflected in the American Bar Association standards and like documents. *Strickland,* 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694.

Our Code of Professional Responsibility for Lawyers provides, "A lawyer shall provide competent representation to a client. Competent

representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Iowa R. Prof'l Conduct 32:1.1. It is well-settled law that a motion for judgment of acquittal must specify the grounds for acquittal. *Truesdell*, 679 N.W.2d at 615. Failure to make a proper motion for judgment of acquittal at trial identifying the specific grounds for the motion is not a trial strategy. Therefore, Brubaker's trial counsel failed to perform an essential duty.

**C. Resulting Prejudice.** In order to prove prejudice resulted from trial counsel's failure to perform an essential duty, Brubaker must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. Brubaker "need only show that the probability of a different result is 'sufficient to undermine confidence in the outcome.'" *State v. Palmer*, 791 N.W.2d 840, 850 (Iowa 2010) (quoting *State v. Graves*, 668 N.W.2d 860, 882 (Iowa 2003)) (internal quotation marks omitted).

Having found that the district court would have sustained trial counsel's proper objection, Brubaker was prejudiced by his trial counsel's failure to object to the sufficiency of evidence and move for judgment of acquittal citing this specific reason. Therefore, Brubaker's trial counsel was ineffective as a matter of law.

**VI. Disposition.**

Had Brubaker's trial counsel made the proper objection, the district court would have found the State failed to establish sufficient evidence to support the conviction of guilt under Iowa Code section 155A.21(1). Therefore, we reverse the judgment for unlawful possession of a prescription drug and remand the case for dismissal of that charge.

**REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**